AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>Apple iPhone 11 with IMEI 35679811389586 and<br>assigned call number 949-279-3066 | )<br>)<br>)<br>)<br>)<br>)    Case No. 8:22-MJ-00634 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

     *See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

     *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     ☒ evidence of a crime;

     ☒ contraband, fruits of crime, or other items illegally possessed;

     ☒ property designed for use, intended for use, or used in committing a crime;

     ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

     *See attached Affidavit*

     ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Braden Ballantyne
_____
*Applicant's signature*

FBI Special Agent Braden Ballantyne
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>

Hon. John D. Early, United States Magistrate Judge
_____
*Printed name and title*

AUSA: Benjamin R. Barron (ext. 3536)

## AFFIDAVIT

I, Braden Ballantyne, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2021. I am currently assigned to FBI Los Angeles Division's Long Beach Resident Agency Domestic Terrorism squad, which investigates residents of the United States who commit violent criminal acts in furtherance of their political or social ideology. I have received training in physical surveillance, terrorism investigations, confidential source management, and electronic surveillance techniques. I have also received both formal and informal training from the FBI regarding electronic communications, and the use of the internet and digital devices in furtherance of crime. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a search warrant for the person of MELANIE CHRISTINE BELGER (BELGER) and an Apple iPhone 11 with IMEI 35679811389586 and assigned call number 949-279-3066 (the SUBJECT PHONE) as described in Attachments A-1 and A-2, for the items to be seized described in Attachment B.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  ITEMS TO BE SEIZED

4.     The items to be seized are digital devices, relating to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful entry and disorderly or disruptive conduct in restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G) (Disorderly or disruptive conduct in Capitol Buildings or Grounds and illegal parading, demonstrating, or picketing in Capitol Buildings) (SUBJECT OFFENSES) as described in Attachment B.

### IV. SUMMARY OF PROBABLY CAUSE

5.     As provided in further detail below, the investigation has revealed evidence that BELGER unlawfully entered the U.S. Capitol Building on January 6, 2021. Based on information known to investigators, evidence of BELGER's unlawful conduct is likely to be found on BELGER's person and in her digital devices.

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

### *Background – The U.S. Capitol on January 6, 2021*

6.    U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.    The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.   On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.   On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.   As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.   At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.   At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.   Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.   At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.   Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others

in the crowd encouraged and assisted those acts.  Publicly
available video footage shows an unknown individual saying to a
crowd outside the Capitol building, "We're gonna fucking take
this," which your affiant believes was a reference to "taking"
the U.S. Capitol.



17.  Shortly thereafter, at approximately 2:20 p.m. EST,
members of the United States House of Representatives and United
States Senate, including the President of the Senate, Vice
President Mike Pence, were instructed to—and did—evacuate the
chambers.  That is, at or about this time, USCP ordered all
nearby staff, Senators, and reporters into the Senate chamber
and locked it down.  USCP ordered a similar lockdown in the
House chamber.  As the subjects attempted to break into the
House chamber, by breaking the windows on the chamber door, law

enforcement were forced to draw their weapons to protect the
victims sheltering inside.

18.   At approximately 2:30 p.m. EST, known and unknown
subjects broke windows and pushed past USCP and supporting law
enforcement officers forcing their way into the U.S. Capitol on
both the west side and the east side of the building.   Once
inside, the subjects broke windows and doors, destroyed
property, stole property, and assaulted federal police officers.
Many of the federal police officers were injured and several
were admitted to the hospital.   The subjects also confronted and
terrorized members of Congress, Congressional staff, and the
media.   The subjects carried weapons including tire irons,
sledgehammers, bear spray, and tasers.   They also took police
equipment from overrun police including shields and police
batons.   At least one of the subjects carried a handgun with an
extended magazine.   These actions by the unknown individuals
resulted in the disruption and ultimate delay of the vote
Certification.

19.   Also at approximately 2:30 p.m. EST, USCP ordered the
evacuation of lawmakers, Vice President Mike Pence, and
president pro tempore of the Senate, Charles Grassley, for their
safety.

20.   At around 2:45 p.m. EST, subjects broke into the
office of House Speaker Nancy Pelosi.

21.   At around 2:47 p.m. EST, subjects broke into the
United States Senate Chamber.   Publicly available video shows an
individual asking, "Where are they?" as they opened up the door

to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.

22.  After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.  One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.   During the time when the subjects were inside the
Capitol building, multiple subjects were observed inside the
U.S. Capitol wearing what appears to be, based upon my training
and experience, tactical vests and carrying flex cuffs.  Based
upon my knowledge, training, and experience, I know that flex
cuffs are a manner of restraint that are designed to be carried
in situations where a large number of individuals are expected
to be taken into custody.





25.  At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

26.  At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.  At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.  Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.  Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.  Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

31.  Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

32.   Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

33.   During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.   Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.   Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed

their activities, including those described above as well as statements about these activities.

36.    Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



1    https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





2 https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

3https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

### Facts Specific To This Application

37.  On September 16, 2022, in the District of Columbia,
BELGER was charged by complaint with 18 U.S.C. §§ 1752(a)(1),
and (2) (Unlawful entry and disorderly or disruptive conduct in
restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D),
and (G) (Disorderly or disruptive conduct in Capitol Buildings
or Grounds and illegal parading, demonstrating, or picketing in
Capitol Buildings). By way of summary, the affidavit in support
of the criminal complaint sets forth the following facts, among
others:

38.  According to records obtained through a search warrant
which was served on Verizon, on January 6, 2021, in and around
the time of the incident, the cellphone associated with 949-279-
3066, an Apple iPhone 11 with IMEI 35679811389586, was
identified as having utilized a cell site consistent with
providing service to a geographic area that included the
interior of the United States Capitol building.

39.  On June 9, 2022, through legal process, I learned that
phone number 949-279-3066 is an Apple iPhone 11 with IMEI
35679811389586 and is registered to Melanie Belger address 10920
Gray Pl., Tustin, CA 92782.

40.  After the January 6, 2021, Capitol Siege, the FBI
received tips and complaints identifying BELGER as a possible
participant in the Siege, citing social media postings made by a
Facebook account used by BELGER.

41.  On July 1, 2022, through legal process, I learned that
Facebook account with UID 1592710084 and username

melanie.a.belger is registered with email address melaniebelger@cox.ent and phone number 949-279-3066.

42.  On January 7, 2021, the FBI received a public tip submitted through http://www.fbi.gov/USCapitol that stated the below image was "From facebook posting of Melanie Belger 2 of 2". A Facebook account used by BELGER posted "I am at the Capitol doors been roped sprayed. Round 2 coming". See image below.



43.  On January 7, 2021, the FBI received a public tip submitted through http://www.fbi.gov/USCapitol that stated the below image was "From Facebook posting of Melanie Belger – file 1 of 2." A Facebook account used by BELGER posted: "Back at hotel! Was in the Capitol im safe.. Pence=NOT SAFE." The submitted screenshot appeared to be taken on Thursday, January 7, 2021. See image below.



44.   On December 7, 2021, I reviewed the YouTube video entitled "D.C. Burning – Jan. 6th DC Riots." According to video acquired through FBI investigation into another Capitol Siege subject, an independent photojournalist recorded video from inside room number ST2M. At around 16 minutes and 15 seconds into the video, a woman with brown hair, sunglasses on her head, a black puff jacket, an American flag bandana around her neck, a white shirt, and holding what appears to be a red beanie and an empty bottle of Captain Morgan Rum appears in the video being captured inside the U.S. Capitol in room ST2M on January 6, 2021. On December 23, 2021, SA Ballantyne attempted to interview BELGER in person. BELGER declined to speak without an attorney present. It appeared to your affiant that the individual described above in the YouTube video closely resembled BELGER.



45.  On December 13, 2021, Special Agent Braden Ballantyne interviewed a former work associate of BELGER at Raj Capitol Investments. The picture below was presented. The former work associate identified BELGER as the individual with sunglasses on her head, black jacket, and white shirt.



**A.    USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS**

46.  Based on my training and experience, I know that individuals traveling outside of their cities of residence to attend large events, such as the demonstration on January 6, 2021, in Washington D.C., typically carry their cell phones with them in order to coordinate their travel plans, use web-based

applications to get directions to unfamiliar locations, and communicate with friends and family both at the event and at home.  Furthermore, based on my training and experience, I know that persons who engage in the SUBJECT OFFENSES will frequently use digital devices, including cell phones, computers, tablets, and other devices, to conduct their criminal activities, take (and store) photographs and videos in order to memorialize their illegal activities, and maintain contact with others involved with the planning, targeting, and execution of the Subject Offenses.

47.  In my training and experience, I know that smart phones are the single most common way in which people now take photographs and instantly share them with others.  As detailed below, in my training and experience, camera and messaging applications on smart phones allow users to take photographs and video– such as those that were taken during the Capitol Riots - and communicate with other users.

48.  Based on my review of public news reports following the events at the U.S. Capitol on January 6, 2021, I know that many individuals involved in the incident used their cell phones to take photographs and videos, as well as to share them on social media applications, both during and after the incident. According to government and open source databases, BELGER previously maintained accounts on social media applications, including Facebook. I know, based on my training and experience, that these Internet-based applications require digital devices to operate and that photographs and videos that are posted to

social media are also generally stored on the digital devices themselves.  Such evidence is therefore likely to be found on the digital devices used by BELGER.  These devices are also likely to have other evidence of BELGER's activities, including evidence of her location in the hours and days leading up to and after the Capitol Riots, Internet searches she conducted regarding the riots, and communications with other individuals regarding the riots.  These devices are also likely to have other evidence of the commission of the Subject Offenses by other rioters who were near BELGER while BELGER recorded activities at and near the Capitol.

49.  Accordingly, I believe that evidence of the SUBJECT OFFENSES, including digital devices used by BELGER to prepare for, commit, document, and discuss the SUBJECT OFFENSES, are likely to be found on BELGER's person.

///

## VI. <u>CONCLUSION</u>

50.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute digital devices, relating to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful entry and disorderly or disruptive conduct in restricted buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G) (Disorderly or disruptive conduct in Capitol Buildings or Grounds and illegal parading, demonstrating, or picketing in Capitol Buildings) will be found on BELGER's person and the SUBJECT PHONE, as described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
September, 2022.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-2**

<u>PROPERTY TO BE SEARCHED</u>

The SUBJECT PHONE is an Apple iPhone 11 with IMEI 35679811389586 and assigned call number 949-279-3066.

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are digital devices, relating
to violations of 18 U.S.C. §§ 1752(a)(1), and (2) (Unlawful
entry and disorderly or disruptive conduct in restricted
buildings or grounds), and 40 U.S.C. §§ 5104(e)(2)(D), and (G)
(Disorderly or disruptive conduct in Capitol Buildings or
Grounds and illegal parading, demonstrating, or picketing in
Capitol Buildings) that have been committed by MELANIE CHRISTINE
BELGER and other identified and unidentified persons, as
described in the search warrant affidavit;

2.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

i

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

1.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

4.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress MELANIE CHRISTINE
BELGER's thumbs and/or fingers onto the fingerprint sensor of
the device (only when the device has such a sensor), and direct
which specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of MELANIE CHRISTINE BELGER's face
with her eyes open to activate the facial-, iris-, or retina-
recognition feature, in order to gain access to the contents of
any such device.  In depressing a person's thumb or finger onto
a device and in holding a device in front of a person's face,

law enforcement may not use excessive force, as defined in
Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

5.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.